METROPOLITAN TRUST CO. OF CITY OF NEW YORK v. HOUSTON & T. C. R. CO. et al. (ten cases).

(Circuit Court, W. D. Texas. December 1, 1898.)

Nos. 228, 220-227, 229.

1. CARRIERS—STATE REGULATION OF RATES—CONSTITUTIONAL RESTRICTIONS.
   A state has power to regulate and fix rates and fares to be charged by public carriers for the carriage of freight and passengers between points within its limits, subject to the limitation that such rates and fares shall not so reduce the earnings of the carrier below what reasonable rates would produce as to deprive it of its property without due process of law, or deny it the equal protection of the laws.

2. SAME—FIXING RATES—ALLOWANCE FOR BETTERMENTS.
   State authorities, in fixing rates to be charged by railroads, should take into consideration betterments and replacements made necessary by the growth of traffic, such as replacing wooden by iron bridges, and similar expenditures beyond ordinary repairs, which must be met from the gross earnings.

3. SAME—VALUATION OF RAILROAD PROPERTY—ELEMENTS OF VALUE.
   The value of a railroad, like that of any other business property, may be a matter of growth; and its location, good will, and established business are elements to be considered in determining such value. It may have been constructed at a time when the condition of the country which it traverses was such as to give no reasonable expectation of immediate profitable earnings, and have been maintained and operated for years without profit to its owners, who may legitimately have relied on the future development of the adjacent territory and of traffic to render the property eventually valuable and profitable; and in such case a mere estimate of the cost of replacing the physical structures of the road is too narrow a basis upon which to determine its value, as the capital on which its owners are entitled to earn dividends, and as the basis for the fixing of rates by the state for the carriage of freight and passengers.

## On Motion for Injunction Pendente Lite.

These are 10 suits in equity, as follows: Metropolitan Trust Company of the City of New York, trustee, against the Houston & Texas Central Railroad Company and others; the Mercantile Trust Company, trustee, respectively against the St. Louis Southwestern Railway Company of Texas and others, the Tyler Southeastern Railway Company of Texas and others, the Texas & Pacific Railway Company and others, and the International & Great Northern Railroad Company and others; the Central Trust Company of New York, trustee, respectively against the San Antonio & Aransas Pass Railway Company and others, and the Missouri, Kansas & Texas Railway Company of Texas and others; Farmers' Loan & Trust Company, trustee, against the Gulf,

Colorado & Santa Fé Railway Company and others; James J. McComb against the Galveston, Harrisburg & San Antonio Railway Company and others; and Frank Storrs and William P. Hillhouse, trustees, against the same. The members of the railroad commission of Texas and the attorney general of the state were made parties defendant in each suit, the object of which is to restrain the enforcement of certain tariff schedules fixing freight rates promulgated by the defendant commission. Heard on motion for injunction pendente lite.

Farrar, Jonas, Kruttschnitt & Gurley, for complainant.

Baker, Botts, Baker & Lovett, for defendant Railway Co.

M. M. Crane and F. A. Fuller, for Reagan and others.

McCORMICK, Circuit Judge. The constitution of Texas, as amended in 1890 (Const. art. 10, § 2), provides:

"Railroads heretofore constructed or which may hereafter be constructed in this state are hereby declared public highways and railroad companies common carriers. The legislature shall pass laws to regulate railroad freight and passenger tariffs, to correct abuses, prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this state, and enforce the same by adequate penalties, and to the further accomplishment of these objects and purposes may provide and establish all requisite means and agencies, invested with such powers as may be deemed adequate and advisable."

In execution of that provision of the constitution, the legislature of Texas passed an act to establish a railroad commission for the state, which act was approved April 3, 1891. Under it the commission was constituted, and began its work by promulgating tariffs for the carriage of freight from one point to another in the state. A number of tariffs, embracing substantially all the commodities which were the subject of freight charges in this state, were promulgated between the constitution of the commission and the 29th day of April, 1892, on which date the creditors of five of the railroads made parties defendant in the suits, the caption of which is given at the head of this opinion, exhibited their bills of complaint against the railroads, and against the members of the commission and the attorney general, exhibiting also the rates that had been promulgated by the commission and adopted by the railroads, and complaining that the rates were unreasonably low, were not compensatory, and were effecting and would effect the confiscation of the rights and properties of the complainant in the railroads, and in the securities thereof of which the complainant was a holder, and would take the property from the complainant's rightful use, and appropriate it to the benefit of the public, without due process of law, and without allowing to the complainant's rights therein the just protection of the laws. On these bills, and after due notice to the defendants, a motion for an injunction pendente lite was presented to me, and heard in July, 1892. The defendant railroad companies answered, admitting substantially the allegations in the bills of complaint. They also took leave and filed cross bills, in which they set up substantially the same matters, and prayed for the same relief, as was pleaded and asked in the original bills. The defendants the railroad commissioners and the attorney general also answered fully, substantially denying the gravamen of the charges made by the original and the cross bills. After a full hearing the injunction pendente lite, substantially as prayed for, was granted, which at the hearing was perpetuated and made final. From this decree the commis-

sioners and the attorney general appealed to the supreme court; and so much of the decree of the circuit court as restrained the enforcement of the rates which had been established by the railroad commission, and which were attacked in those suits, was affirmed. For a further statement of these cases I refer to the report thereof in 154 U. S. 362–420, 14 Sup. Ct. 1047–1062. In August, 1894, the railroad commission began to make and establish new rates, tariffs, schedules, classifications, and orders, which they promulgated and intended as schedules of rates of charges for the transportation of the articles named therein over the railways of the state, with modifications and exceptions as to certain of the railways and parts of railways set out in their published tariffs and circulars affecting the same. The rates established are not maximum rates, but in each instance are absolute rates, from which the carrier is not permitted to depart without previously obtained leave of the commission. The hearings before the commission, and the action thereof, have been almost continuous from August, 1894, to the 31st of October, 1898, when these bills were exhibited. On the 6th day of October, 1898, the commission had published a new tariff affecting the carriage of cotton in bales, which was to take effect, by a subsequent order postponing the date, on the 1st of November. The commission had also issued notice of other hearings to be had looking to the reduction of rates on other commodities, entering largely into the tonnage of the different carriers. The bills, duly verified, and supported by other affidavits, and accompanied by exhibits showing the rates that had been propounded and put into effect, and the rate that was to go into effect on the 1st day of November, were submitted to me on the 31st of October, with an application for a restraining order to prevent the going into effect of the new commodity tariff, I—C, cotton in bales, until the hearing of the motion for injunction. The application was granted, and a restraining order issued in conformity thereto.

The bills in these 10 cases are substantially similar. The details as to the construction, mileage, incumbrances, and net earnings of the various roads differ, of course, the one from the other. The substance, however, in each case, substantially shows the history of the construction or acquisition of the railroads, the operation and betterments, and the actual cost thereof, as nearly as it can be known or estimated, the capitalization of each, and the effect upon the net earnings of each by the rates fixed and enforced by the commission, showing in each case that the rates theretofore established voluntarily by the railway companies were reasonable, and such as competitive, commercial, and financial conditions warranted and required; that the system of rates now enforced by the commission, and proposed to be enforced, is unreasonably low, and lower than the rates enjoined in the former suits, to which reference has been made, and will and have in each instance so reduced the net earnings of each of the roads that neither they nor any of them can earn, nor have earned, revenue sufficient to meet their running expenses, including replacements and repairs, and such betterments as the advancing business of the roads and the requirements of such traffic render necessary to be made, and to earn a reasonable compensation for the services rendered in the transportation of the freights moved. They allege that each and all of the rates,

rules, and regulations established by the railroad commission were made and established by the commission in pursuance of the design and purpose repeatedly avowed by it, and which are its settled policy, to reduce the rates of the railroad companies until they reach a level that will, when applied to the ordinary volume of traffic, yield to the company no more revenue than will be sufficient, after paying operating expenses and ordinary repairs, to pay a reasonable return in the way of interest or dividends on a sum which the commission has assumed and stated to be sufficient to construct a similar railroad at the present time; that in pursuance of this policy and design the railroad commission has made, in the manner pointed out in the bill, an estimate of the present value of each of the railways and its appurtenant property, and filed the same in the office of the secretary of state, and has repeatedly avowed that the sum thus ascertained was the limit of the amount upon which the companies should be entitled to earn returns. It is averred in the bills that this value fixed by the commission is in each instance greatly less than the actual cost of constructing, acquiring, equipping, and bringing to the present state of excellence the railways included in these suits, and is greatly less than the real value of each of said railroads. The bills are long, and embrace much detail which I have not thought it necessary to notice. They set out the operation of the tariffs imposed by the commission, and show such loss of net earnings occasioned thereby as prevents the most prosperous of the roads from earning a reasonable return on the value of its property, and a reasonable compensation for the services rendered, to an extent that, if continued, must result in the bankruptcy of the railroads, and their utter inability to keep their railways up to the standard required by the advancing and advanced stage of railroad transportation, and will result in the taking of the property without due process of law, and without affording to it the equal protection of the laws, in violation of the constitution of the United States; on which grounds they pray that the tariffs, rates, regulations, and orders establishing and enforcing this system of rates be enjoined.

The answer of the commission denies substantially all of the material allegations of the bill and cross bill in each case in which a cross bill was filed, and in the bill and the intervening petition of the Missouri, Kansas & Texas Railway Company in the case against the Missouri, Kansas & Texas Railway Company of Texas. It follows the bill, section by section, in each case; denying the substantial allegations, and making counter averments thereto, especially on the subject of the value of the railways and their equipments, and on the subject of their earnings as shown by their annual reports to the commission. In reference to the valuation of the roads, the defendants deny that the rates fixed by the railroad commission of Texas are fixed upon any arbitrary basis, except upon the basis of the actual value of the railroad property; and they allege that, in order to ascertain the value of said property, they did not fail to consider every element that would necessarily enter therein, including the actual cost of reproducing said road, the cost of the services of supervising engineers, legal counsel fees, and interest on the money invested during the period of construction; that to this end they caused an examination of said property to be made, and the valuation thereof to be made, as stated in the com-

plainant's bill of complaint; that the same was examined by a careful and experienced civil engineer, and that upon such examination estimates were made by such civil engineer on a consideration of all the facts connected therewith; that they notified the railroad company, as the law required them to do, that this valuation had been made, and invited them to make objections thereto, if objections they had; that 50 days were allowed the company to make objections to the valuation, and there were none made and none suggested by the company; that thereafter a statement of the valuation was filed with the secretary of state as required by law. Therefore these defendants say that the railroad company and the complainant are estopped from denying the correctness of the valuation therein made.

The Houston & Texas Central Railroad Company, the successor to the Houston & Texas Central Railway Company, has a mortgage indebtedness equal to about $34,000 to the mile of its main line, and has stock outstanding to the amount of $10,000,000, making its stock and bonds equal to the sum of about $53,000 to the mile of its main line. The bill in this case avers that the defendant company and its predecessor company have necessarily expended in cash in the construction and equipment and betterment of the lines of the defendant company about $62,000 per mile of its said railways; that the lines of railway of the defendant company have at all times been operated as economically as practicable; that its operating expenses have at all times been as reasonable and low in amount as they could be made by economy and judicious management; that the company has at all times secured the services of its officers and employés as cheaply as practicable, and has employed no more than was necessary, and at fair and reasonable rates of pay; that it has at all times secured all supplies, material, and property of every character used in the operation of its railways at the cheapest market price, and at rates as low as the same could be secured, and has secured and used no more than was actually necessary for the operation of its railways. Substantially the same allegation is made in the cross bill, and both are affirmed and sustained by affidavits of competent witnesses offered on the hearing of this motion. The valuation placed upon the property of this railroad corporation by the railroad commission of Texas is, in round numbers, $24,000 per mile. This statement shows the vast difference between the estimates made by and on behalf of the railroad company and the estimates made by the railroad commission of the value of the railroad's property on which it is entitled to earn some profit. It seems to be clear from the answer of the commission, the tone of the affidavits which it offers in support of its answer, and the argument of the attorney general and the assistant attorney general who represented it on this hearing, that in estimating the value of this railroad property no allowance was made for the favorable location of the same, in view of the advance in prosperity of the country through which it runs, and the increment to its value due to the settling, seasoning, and permanent establishment of the railways, and to the established business and the good will connected with its business, which has been established through a long series of years, and all of which ought reasonably to be considered in fixing the value of the property and the capitalization upon which at least it is entitled to earn, and should pay, some returns

by way of interest or dividends. This is practically the oldest railroad in the state. A few miles of another road were built earlier, but this road, running throughout the whole course of its main line through what is now the most populous and best-developed portions of the state, and still rapidly increasing in population and development, has established a business that would not and could not be disregarded in estimating the value of the railroad, if considered solely as a business property and venture. It cannot be so considered, because of its quasi public nature. Its duties, its obligations, and its liability to control are elements that must be considered. As popularly expressed, the rights of the people—the rights of shippers who use it as a carrier —have to be regarded; but, as judicially expressed, these last have to be so regarded as not to disregard the inherent and reasonable rights of the projectors, proprietors, and operators of these carriers. It is settled that a state has the right, within the limitation of the constitution, to regulate fares. From the earliest times public carriers have been subject to similar regulations through general law administered by the courts, requiring that the rates for carriage should be reasonable, having regard to the cost to the carrier of the service, the value of the service to the shipper, and the rate at which such carriage is performed by other like carriers of similar commodities under substantially similar conditions. But neither at common law nor under the railroad commission law of Texas can the courts or the commission compel the carriers to submit to such a system of rates and charges as will so reduce the earnings below what reasonable rates would produce as to destroy the property of the carrier, or appropriate it to the benefit of the public. The cost of the service in carrying any one particular shipment may be difficult to determine, but the cost to the carrier of receiving, transporting, and delivering the whole volume of tonnage and number of passengers in a given period of time must include, as one of its substantial elements, interest on the value of the property used in the service. In countries conditioned as Texas has been and is, such a railroad property and business cannot be reproduced, except substantially in the same manner in which this has been produced; that is, by a judicious selection of location, by small beginnings, and gradual advance through a number of years, more or less, of unproductive growth. The particular location of this road, of course, cannot be reproduced, and it cannot be appropriated by another private or quasi public corporation carrier by the exercise of the state's power of eminent domain. And, even if the state should proceed to expropriate this property for the purpose of taking the same to itself for public use, the location of this road cannot be appropriated, any more than any other property right of a natural person or of a corporation can be appropriated, without just compensation. It is therefore not only impracticable, but impossible, to reproduce this road, in any just sense, or according to any fair definition of those terms. And a system of rates and charges that looks to a valuation fixed on so narrow a basis as that shown to have been adopted by the commission, and so fixed as to return only a fair profit upon that valuation, and which permits no account for betterments made necessary by the growth of trade, seems to me to come clearly within the provision of the fourteenth amendment to the constitution of the United

States, which forbids that a state shall deprive any person of property without due process of law, or deny any person within its jurisdiction the equal protection of the laws. It is true that railroad property may be so improvidently located, or so improvidently constructed and operated, that reasonable rates for carriage of freights and passengers will not produce any profit on the investment. It is also true that many railroads not improvidently located, and not improvidently constructed, and not improvidently operated may not be able, while charging reasonable rates for carriage of freight, to earn even the necessary running expenses, including necessary repairs and replacements. And there are others, or may be others, thus constructed and conducted, which, while able to earn operating expenses, are not able to earn any appreciable amount of interest or dividends for a considerable time after the opening of their roads for business. This is true now of some of the roads, parties to these bills. At one time or another, and for longer or shorter times, it has been true, doubtless, of each of the roads that are parties to these bills. Promoters and proprietors of roads have looked to the future, as they had a right to do, and as they were induced to do by the solicitation of the various communities through which they run, and by various encouragements offered by the state. The commission, in estimating the value of these roads, say that they included interest on the money invested during the period of construction. This is somewhat vague, but the "period of construction" mentioned is probably limited to the time when each section of the road was opened to the public for business. And even if extended to the time when the road was completed to Denison and to Austin in 1873, nearly 20 years after its construction was begun at Houston, it would not cover all of the time, and possibly not nearly all of the time, in which the railroad company and its predecessors have lost interest on the investment. The estimate made on behalf of the railroad in this case of the cost to that company and to its predecessor company of the railroad property, and the business of that company as it exists to-day, may not be exactly accurate,—clearly is not exactly accurate; but it seems to me that it is not beyond the fair value of the property, as it is shown to have been built up and constituted, and to exist to-day as a going business concern, and that such rates of fare for the carriage of persons and property as are reasonable, considered with reference to the cost of the carriage and the value of the carriage to the one for whom the service is rendered, cannot be reduced by the force of state law to such a scale as would appropriate the value of this property in any measure to the use of the public without just compensation to the owners thereof, and would deprive the owners thereof of the equal protection of the law guarantied by the constitution of the United States, as cited.

It seems to be contended that the case of the Houston & Texas Central Railroad Company fully justifies the action of the commission in its imposition of a system of rates, because, as it is urged, it has made earnings over and above operating expenses sufficient to pay the interest on its outstanding bonds, and has a small surplus of a few thousand dollars in excess, as shown by its return to the commission of the operations of the year ending the 30th of June, 1898; in other words, it has

90 F.—44

paid interest on $34,000 of bonds to the mile. The return referred to is made on forms submitted by the commission, and under the item of "operating expenses" only ordinary repairs and replacements are allowed. In case an insufficient wooden bridge is replaced by an adequate iron bridge, that is treated as a betterment, and not permitted to figure in the returns as a part of the operating expenses. The bill and cross bill show that, if such betterments, which can only be made or procured out of the earnings of the road, were allowed in the return of operating expenses, the revenue earned and rendered as net revenue would not have been equal, by several hundred thousand dollars, to the interest on the bonded indebtedness; that the bonded indebtedness outstanding against this road being in excess of the value fixed by the commission, to the extent of more than 50 per cent., the company has no means of providing for such betterments, if not at all allowed to charge them at any time against the gross earnings of the road. More than this, it is shown that the road has never at any time paid any dividend upon its stock. On the whole case, as made in the case of the Houston & Texas Central Railroad Company, it seems clear to me that the system of rates adopted and enforced by the commission does not afford to the owners of this property the equal protection of the law, and takes from the owners and stockholders the property they have therein, without just compensation, and that, therefore, the rates must be held to be unreasonably low, unjust, and confiscatory, and should not be submitted to, and cannot be suffered to be enforced. As already said, the case made for relief in each of the other suits seems to be stronger than the case of the Houston & Texas Central Railroad Company; and the evidence appears to me to show clearly that the system of rates imposed is, as to each of the roads, unreasonably low, unjust, and confiscatory. Therefore the prayer of the bill in each case is granted, to the extent of enjoining the roads from adopting the rates heretofore promulgated by the commission, and enjoining the commission and the attorney general from enforcing the same, and enjoining all persons claiming thereunder from prosecuting the railroads, or any of the officers thereof, for the nonobservance of the system of rates heretofore promulgated by the commission.