Ralph O. Johnson Attorney Pahokee
QUESTION:
If the City of Pahokee's water and sewer revenue bonds of 1977 were authorized by resolution of the city dated February 22, 1977, and duly validated in the circuit court on March 25, 1977, but not executed and delivered until long after May 4, 1977, have they been issued in the legal sense and within the meaning of that term as used in Ch. 77-251, Laws of Florida, effective October 1, 1977?
SUMMARY:
A municipality's water and sewer revenue bonds which were authorized to be issued and dated as of the date of their delivery and duly validated before the effective date of Ch. 77-251, Laws of Florida (October 1, 1977), removing the authority of municipalities to levy the municipal public service tax on the purchase of cable television service, but permitting continuation of the levy of such tax to the extent necessary to meet bond obligations to or for the benefit of bondholders of bonds issued prior to May 4, 1977, but which were not actually executed and delivered until long after that date and the effective date of Ch.77-251, were not `issued' in the legal sense or in the sense in which the term is used in the context of Ch. 77-251, and as defined in the Uniform Commercial Code before the prescribed limiting date, there being no legislative intent manifested in Ch.77-251 that a different meaning be ascribed to such term in the application of that statute.
Your question is answered in the negative.
Section 166.231(1)(a), F. S., as amended by s. 4, Ch. 78-299, Laws of Florida, provides in pertinent part:
 (1)(a) A municipality may levy a tax on the purchase of electricity, metered or bottled gas (natural liquefied petroleum gas or manufactured), water service, telephone service, and telegraph service. . . . Municipalities imposing a tax on the purchase of cable television service as of May 4, 1977, may continue to levy such tax to the extent necessary to meet all obligations to or for the benefit of holders of bonds or certificates, which were issued prior to May 4, 1977. (Emphasis supplied.)
Chapter 77-251, Laws of Florida (Senate Bill No. 660), deleted or removed from s. 166.231(1)(a), F. S., the authority of municipalities to levy the public service tax on the purchase of cable television service and added to said subsection the provisions underscored above, effective October 1, 1977. The added provisions specifically authorize those municipalities imposing the tax on cable television service as of May 4, 1977, to continue to levy the tax `to the extent necessary to meet all obligationsto or for the benefit of holders of bonds or certificates, whichwere issued prior to May 4, 1977.' (Emphasis supplied.)
There has been no specific information supplied this office as to the date that the bonds in question were in fact executed and delivered to the bondholder. The enabling resolution simply provides that the subject obligations of the city `are hereby authorized to be issued' and `shall be dated as of the date of their delivery.' Resolution 77-6, Art. II, ss. 2.01, 2.02. However, based on the facts recited in your inquiry, we assume forthe purpose of this opinion that the revenue bonds were executed and delivered after May 4, 1977, although they were validated on March 25, 1977. Apparently, the bonds were actually executed and delivered to the bondholder sometime during the summer of 1978, interim financing for the sewer and water project being arranged through a local bank. As to the issuance and delivery of the bonds in question within the contemplation of law, Ch. 77-251, supra, was operative and in force and effect and its validity is presumed for purposes of this opinion.
Considering the context of, or the language used in, Ch. 77-251, Laws of Florida, the answer to your inquiry turns on the legislative intent and use of the word or term `issued,' and on the legal meaning or sense of that term when used in relation to bond issues by courts and by the Uniform Commercial Code (formerly under the Negotiable Instrument Law). At all times material to this opinion, the Uniform Commercial Code, s. 673.102(1)(a), F. S., defined `issue' to mean the first delivery of an instrument to a holder or remitter. The precursor Negotiable Instrument Law defined the term to mean the first delivery of the instrument, complete in form to a person who takes it as a holder. Section 674.01, F. S. 1965. Both the Uniform Commercial Code s. 673.102(1)(e), F. S., and the Negotiable Instrument Law, s. 674.01, F. S. 1965, define `instrument' to mean `[a] negotiable instrument,' which the revenue bonds under consideration are. The definition of `delivery' in s. 671.201(14), F. S., with respect to instruments or securities as `the voluntary transfer of possession' is similar to, and is a broadening of, the definition of that term in the former Negotiable Instruments Law at s. 674.01, F. S. 1965, wherein `delivery' was defined to mean `the transfer of possession, actual or constructive, from one person to another.' See Art. II, s. 2.06, Resolution 77-6, City of Pahokee, providing that bonds `shall be and shall have all the qualities and incidents of negotiable instruments under the law merchant and the laws of the State of Florida' and s. 2.08, Form of Bonds. Seealso s. 678.102(1), F. S., defining `security' and s. 678.105(1), F. S., providing that securities governed by that chapter are negotiable instruments.
We begin with the proposition that in enacting Ch. 77-251, Laws of Florida, codified as s. 166.231(1)(a), F. S., the Legislature was presumed to know about existent judicial and statutory definitions and uses of the term `issued' or similar and related terms and existent statutory provisions in relation to bond issues or the issuance of bonds. See Adler-Built Industries, Inc. v. Metropolitan Dade Co., 231 So.2d 197 (Fla. 1970); Williams v. Jones, 326 So.2d 425 (Fla. 1975). In effect then, in using the term `issued' in Ch. 77-251 in relation to `all obligations to or for the benefit of holders of bonds or certificates,' the Legislature must be presumed to have meant what it said and to have employed the term in the sense that it meant in subject context. See State v. Tunnicliffe, 124 So. 279 (1929), Thayer v. State, 335 So.2d 815 (1976).
In Mize v. County of Seminole, 229 So.2d 841, 847-848 (Fla. 1969), the court extensively quoted from City of Jacksonville v. Renfroe,136 So. 254, 256 (Fla. 1931), which case involved the authorization and validation by the city of certain street improvement and auditorium bonds prior to the effective date of s. 6, Art. IX, State Const. 1885, which required freeholder approval in all such cases. Some of the bonds had been sold prior to the amendment and some had remained unsold. A suit was brought to enjoin the city from selling the bonds which remained unsold after the passage of the constitutional amendment. The complaint in that case alleged that all of the bonds were authorized and validated prior to the adoption of the constitutional amendment and therefore were not affected thereby. In upholding the action of the trial court in Renfroe in enjoining the sale of the remaining bonds, the court stated:
 Section 6, article 9 of the Constitution, as amended . . . provides in part as follows `. . . Municipalities of the State . . . shall have power to issue bonds only after the same shall have been approved . . . .'
 This section of the Constitution divests . . . municipalities of any authority which (they) may have theretofore enjoyed to issue bonds except upon the compliance with . . . this section. Bonds such as those here under consideration are negotiable instruments, and are controlled by what is generally known as the negotiable instrument statute of this state, section 4674, Rev. Gen. St. 1920, section 6760, Comp. Gen. Laws 1927, which in part provides as follows: "Issue' means the first delivery of the instrument, complete in form to a person who takes it as a holder.' Under this definition of `issue' the bonds here under consideration had not been issued. The negotiable instrument statute was in effect at the time the above-quoted amendment to our Constitution was adopted, and we hold that the statutory definition then in force is to be applied to the word `issue' as contained in this provision of the Constitution. (Emphasis supplied.)
 In Potter v. Lainhart, 44 Fla. 647, 33 So. 251, 259, it was held: `The word `issued,' as applied to bonds, usually includes delivery, but it does not invariably do so.' But, where a different meaning is to be given the word `issue,' the intention to give it such different meaning must appear upon the face of the act or document in which it is used. The word `issue' is used in the section of the Constitution above quoted without any other language being used to indicate that any except the general meaning is to be applied to such word.
 The bonds under consideration here were authorized, executed, and validated, but before being issued as contemplated by law under the definition given in section 4674, Rev. Gen. St. 1920, section 6760, Comp. Gen. Laws 1927, the organic law was amended in such manner as to bring the issuance of these bonds in conflict with its provisions.
The court in Mize observed that in the number of cases prior to and since the time of the Renfroe decision, the court had held that bonds are not `issued' until they have been duly executed and delivered, Mize at p. 848; and expressly held that it did not overrule City of Jacksonville v. Renfroe, supra. The Mize Court did, however, hold that under the particular circumstances of that case and the provisions of ss. 2 and 7(b), Art. XII, State Const., the bonds there involved could be issued and sold even though they were validated at a time when the electorate or freeholders did not have the right to vote upon the propriety of that particular issue. No such considerations, nor the cited constitutional provisions, are present or apply to the instant situation relative to subject water and sewer revenue bonds. Everything said in the quoted matter in Mize from Renfroe, supra, in construing the cited constitutional provision there involved with the former Negotiable Instrument Law's definition of `issue,' at s. 674.01, F. S. 1965, is as applicable to the term `issued' as employed in Ch. 77-251,supra, and defined in s. 673.102(1)(a), as it was to the construction of former s. 6, Art. IX, State Const. 1885 and the existent statutory definitions of that term and related terms hereinbefore discussed in the Uniform Commercial Code likewise apply to and govern the term `issued' as used in Ch. 77-251. There is nothing in the language or terms of Ch. 77-251 to evidence any legislative intent that any different meaning be given the term `issued' as employed in the context of Ch. 77-251, codified as s.166.231(1)(a), F. S. See also 48 C.J.S. 778 defining the term `issued,' the past participle of the verb `issue,' to mean `emitted or sent forth; delivered or put into circulation; delivered to the purchaser; caused to go forth or to be delivered; assigned, transferred to delivered; sent out'; 48 C.J.S. 777 defining the verb `issue,' in its transitive sense, to mean, among other things, `to send or let out; to emit; to deliver; to put into circulation; to send out; to send forth'; and Potter v. Lainhart, *4380 33 So. 251, 259 (Fla. 1902), stating that the word `issued,' as applied to bonds, usually includes delivery, but it does not invariably do so, since the sense in which such word is used by the Legislature should control in construing and applying a statute. The context of s. 166.231(1)(a), F. S., manifesting no legislative intent to the contrary, I must conclude that the definition of the word `issue' in a. 673.102, F. S., as meaning the first delivery of an instrument to a holder, as well as the judicial precedents cited in Mize at page 848, footnote 9, holding that bonds are not `issued' until duly executed and delivered, is to be applied to the term `issued' as it is used in s.166.231(1)(a). Article II, s. 2.02 of Resolution 77-6, Descriptionof Bonds, providing that `the bonds shall be dated as of the date of their delivery,' seems to indicate that the governing body of the city contemplated that the legal `issuance' of subject bonds was to occur at the time of their delivery since the obligation of such bonds is fixed as of the date of their delivery by the enabling resolution. Section 2.01 of Article II of the resolution states that `obligations of the Issuer . . . are hereby authorized to be issued' and obviously contemplates the actual issuance thereof in futuro. As noted in Mize at page 848, the obligation of these bonds is fixed at the date of their issuance and delivery.
Since the City of Pahokee's water and sewer revenue bonds were not actually executed and delivered to the bondholder until long after May 4, 1977, and the effective date of Ch. 77-251 (s.166.231(1)(a), F. S.), such revenue bonds were not `issued' in the legal sense or in the sense in which the term is used in Ch.77-251 and as defined in s. 673.102, F. S., before the critical statutory limiting date, there being nothing in the context of Ch.77-251 manifesting a legislative intent that a different meaning be given the term in applying the statute. The legal consequence or effect is that the City of Pahokee is without authority of general law to continue to levy its public service tax on the purchase of cable television service after September 30, 1977, for the benefit of the holders of subject revenue bonds `issued' after May 4, 1977, as well as after the effective date (October 1, 1977) of Ch. 77-251, supra.
Apart from the foregoing, Rosolution 77-6, s. 1.02(c)(i), Art. I, finds that the issuer of subject bonds had theretofore enacted an ordinance levying a utilities service tax on designated utility services, but not including cable T.V. service, the proceeds of which tax are thereafter referred to in the resolution as the `Excise Taxes,' and ss. 1.02(D) and 3.02 of Article III thereof operate to pledge the proceeds of such excise taxes (not including excises on cable T.V. service) to the payment of the principal of and interest on the bonds, and further provides:
 It is deemed necessary and desirable to pledge as additional security for the payment of the principal and interest on the bonds all moneys of the Issuer derived from sources other than ad valorem taxation which shall be legally available for such purpose.
Section 2.08, Art. II, Form of Bonds, of the resolution provides that the bonds are payable solely from and secured by a lien upon and a pledge of revenue of the project being financed and the above-referenced `Excise Taxes' and payable additionally from sources other than ad valorem taxation and legally available for such purpose. Section 3.02, Art. III, of the resolution provides that the payment of the debt service of these bonds shall be secured by a pledge of and a lien upon the operating revenues and the excise taxes and a pledge of and all moneys of the issuer derived from sources other than ad valorem taxation and legally available for such purpose.
It appears from the foregoing analysis of the enabling resolution that no pledge of any excise taxes on cable T.V. service was ever expressly or specifically made by the city. Since the advent of Ch. 77-251, Laws of Florida, such tax is not a `source other than ad valorem taxation and (is not) legally available for such purpose.'
Prepared by: Maxie Broome, Jr., Assistant Attorney General